UNITED STATES *v.* ARKELL SAFETY BAG CO.

**No. 4513.**—Invoices dated Forshaga, Sweden, August 28, 1930; April 7, December 30, 1932; July 11, 1934; June 18, 1931.

Certified August 29, 1930; April 8, 1932; January 3, 1933; July 12, 1934; June 18, 1931.

Entered at New York September 10, 1930; April 21, 1932; January 18, 1933; July 26, 1934; July 1, 1931.

Entry Nos. 739595/1, 842863/1-2-3, 781795, 708139, 700364.

Third Division, Appellate Term

(Decided February 4, 1939)

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) for the appellee.

Evans, Judge: These are applications for review of the decision of a single judge involving the value of kraft paper imported from Sweden. The decision below was reported in Reap. Dec. 4301. The importations took place during the years of 1930, 1931, 1932, 1933, and 1934. It was the contention of the Government below and before this court that the proper value is the foreign-market value in Sweden, while the importer claims that the domestic market in Sweden is a controlled market and that the paper is dutiable upon the export value.

The record in the initial case was offered and received in evidence in the following cases: Reappraisements 103001-A, 105065-A, 108865-A, and 115858-A. All of the appraisements under review covered so-called duress entries. Reappraisement 115858-A under 100572-A, and reappraisement 115859-A under 99627-A, were before Judge Sullivan and were dismissed (Reap. Circ. 2368) under authority of the case of *Innis, Speiden & Co.* v. *United States*, 19 C. C. P. A. 1, T. D. 44789 and *United States* v. *Friedlaender*, id. 334, T. D. 45498, for the reason that the appraisements were there held to be void. Thereafter a legal appraisement was made and the instant appeals were perfected.

The testimony before the single judge in the instant case consisted of four affidavits received in evidence and the oral testimony of two witnesses on behalf of the plaintiff. The Government's case rests upon Exhibits 5 to 11, inclusive, the same being reports of Treasury representatives, and the incorporated record in the case of *United States* v. *Arkell Safety Bag Co.*, 22 C. C. P. A. (Customs) 258, T. D. 47210, reported on remand in *Arkell Safety Bag Co.* v. *United States*, 24 C. C. P. A. (Customs) 26, T. D. 48307.

The decision below reviewed the testimony as produced and we do not deem it advisable or necessary to discuss extensively the same. Suffice it to say that in our opinion the judge below reached the correct conclusion when he held that the evidence clearly established that the market for home consumption of this type of paper in Sweden is a restricted market as defined in the decision of *United States* v. *Philipp Wirth et al.*, 20 C. C. P. A. (Customs) 94, T. D. 45705, and other cases cited in the decision. The special agent's report (Exhibit 6) states:

Not only are the mills selling prices fixed, but resale prices are also fixed by agreement between the paper mills and the paper wholesalers.

On review the appellee's attorney seeks to escape the effect of the decision in this respect by calling attention to the fact that the mills in Sweden sold to three types of purchasers without exacting the obligation taken under the cartel agreement made by mills and distributors generally, which bound them to an established resale price, so that such persons might be at liberty to sell in the open market.

We think the evidence does not support that theory because the cartel arrangement provides that if any of these types of buyers should sell such paper, then they must come under the cartel arrangement or contract.

The question of a restricted market was not raised in the record introduced in evidence. The court there found a foreign-market value. Here the controversy is as to whether the foreign-market value or the export value shall apply. We think the record establishes the fact that the foreign market was a restricted market and therefore that the lower court in the instant case was correct when it said that on the evidence it believed the export value was a proper basis for appraisement.

The single judge stated what he considered to be the issue in the following language:

So, as I understand it, the only question for me to decide in this case is, Was there a controlled market in Sweden for such or similar merchandise as the merchandise contained in all the instant importations at the times of the exportation of the instant merchandise? If there was not a controlled market in Sweden at that time, then the correct dutiable value of all the instant importations is the appraised value based upon the basis of foreign value. On the other hand, if there was a controlled market in Sweden for such or similar merchandise as contained in the instant importations at the times of exportation of all the instant merchandise, and that the prices of such or similar merchandise sold in Sweden and exported to other countries was no higher than the price paid for the paper of such or similar merchandise for importation to the United States, then, in my judgment, the correct dutiable value of the instant merchandise is the export value.

The intent of the last sentence in the foregoing paragraph is not clear to this court. We do not understand that sales for export to countries other than the United States can be considered in determining export value as defined in section 402 (d) of the Tariff Act of 1930. That value is defined as follows:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The opinion below correctly states that export prices to foreign countries may be considered under the ruling of the case of *United States* v. *Livingston & Southard, Inc.*, 23 C. C. P. A. (Customs) 214, T. D. 48060, in determining the correct foreign value. However the export value as defined above is the value at which such or similar merchandise is freely offered to all purchasers, etc., *for export to the United States*. The court below concluded that the record incor-

porated was of no probative value in this case. We agree with that finding except that the incorporated record and the decision therein are decisive on the question of the similarity of the imported merchandise and that sold in the home market.

We proceed to review the evidence concerning the findings of export value.

The merchandise is described on each of the invoices as follows:

| Reappraisement | Invoice description | Invoice No. |
|---|---|---|
| 115859–A | 109 Rolls M. G. Kraftpaper | |
| 103001–A | 122 Rolls of M. G. Kraftpaper | 317 |
| | 16 Rolls unglazed Kraftpaper | 322 |
| | 40 Rolls M. G. *Blue* Kraftpaper | 321 |
| 105065–A | 50 Rolls of M. G. *Blue* Kraftpaper | 6 |
| | 122 Rolls of M. G. Kraftpaper | 2 |
| 108865–A | 40 Rolls of M. G. *Blue* Kraftpaper | 774 |
| | 18 Rolls of M. G. Kraftpaper | 775 |
| 115858–A | 32 Rolls of M. G. *Blue* Kraftpaper | 613 |

The affidavits introduced in evidence were introduced for the purpose of establishing that the foreign market was a controlled market and give no information concerning the statutory export value. It is a singular fact that one of these affidavits recites that 90 per centum of the business of the paper mills in Sweden consists of export business, yet it gives no information concerning the fact that there was an organization in Sweden which controlled the sale price for export. That fact is clearly established by the special agent's report. The organization was known as Scankraft. Exhibit 6 recites:

Scankraft fixes minimum prices as well as selling terms and conditions for various export markets, including the United States, and its members are obliged, under penalty, to adhere to such prices and conditions.

The affidavit of Torsten Rädberg, sales manager of the Aktiebolaget Mölnbacks Trysil, Forshaga, which we understand to be the sales agency in Sweden that made the sales in question, states (Coll. Exhibit 3):

The Swedish Paper Mills Association have no restrictions of any Kraft paper offered for export by the members of the Association and such paper is freely offered for export to any firm buyer.

If this statement was intended to convey the impression that there was no sales organization which controlled the export sales price, it is in conflict with the report of the special agent as well as with the statement given by Chr. von Sydow (Exhibit A; part of Exhibit 6) to Treasury Attaché May. This statement is headed "Scankraft, the Price Quoting Association of the Swedish, Norwegian, and Finnish Kraft Paper Manufacturers," and among other things it states:

For this purpose, and in the manner provided for in its detailed regulations, the Association has to fix minimum prices and give binding directions relating to market protection, conditions of sale, terms of payment, and regulations of out-

put, and has also to endeavor to cooperate with kraft paper manufacturers in other countries.

In spite of the fact that the importer is claiming export value, he did not produce a copy of the price list issued by the Scankraft, the price quoting association of the Swedish mills, although Exhibit A, *supra*, states:

The first price list is an integral part of the agreement, and alterations require the affirmative vote of a qualified majority at a general meeting.

However it does not appear from the testimony that this organization restricts the resale price.

Taking up the testimony on behalf of the importer concerning the export value, Mr. George F. Baine stated that he was a salesman for the Borregaard Co., the sole agents for the Mölnbacka-Trysil paper mill in Sweden. According to Exhibit C 1, part of Exhibit 6 (a translation of the cartel agreement) this mill is one of a number of mills that signed the cartel agreement entitled Svenska Pappersbruksforeningen, literally translated "Swedish Paper Mills Association." The witness Baine stated that he sold all of these orders to the importer herein and gave evidence in part as follows:

By Mr. SHARRETTS:

Q. Now, within your experience, Mr. Baine, of these transactions that you negotiated for sale to American purchasers, on behalf of the foreign Swedish mill, during any given period were the prices to the different purchasers the same?—A. Yes, sir.

Q. And these entered prices here represent the price at which these different sales were being made?—A. Yes, sir.

Q. What percentage of the sales made by the Swedish mill to American purchasers through your company do you personally negotiate?—A. All of them.

Q. Was that true during 1930?—A. Yes, sir.

Judge KINCHELOE. You made all the sales from that manufacturer in this country here in 1930?

The WITNESS. Yes.

By Mr. SHARRETTS:

Q. And do the entered prices in all cases represent that selling price?—A. Yes, sir.

Mr. Edwin D. Green testified that he made the purchases of the instant paper on behalf of his company and he stated that the invoices showed the prices which he actually paid in every case.

The most that can be claimed for this testimony is that it establishes that this mill through its selling agent treated all of its customers in America alike, and it falls far short of establishing the freely offered for sale price to all purchasers for export to the United States, since this concern represented but one of many mills.

On the question of the usual wholesale quantity we deem it worth while to quote from the record which shows that importer's attorney undertook to make proof on this point but that he completely failed to do so.

Judge KINCHELOE. What is the usual wholesale quantity in this country?

Mr. SPECTOR. I will have to object to the question.

Judge KINCHELOE. If you know. I am asking him what he deems a wholesale quantity?

Mr. SPECTOR. That has been determined by the court of appeals.

Judge KINCHELOE. The court wants to find out all the facts in this case, if this man knows, in his opinion, what it is. Do you know?

Mr. SPECTOR. Exception.

The WITNESS. Well, you mean wholesale quantity of imported kraft?

Judge KINCHELOE. Yes; in this country.

The WITNESS. I don't think there is any fixed amount to determine wholesale—we do not sell to retailers; we only sell to wholesalers.

Mr. SPECTOR. I move to strike out the classification part of his answer which says, "We do not sell to retailers; only for wholesalers," as calling for a conclusion.

Judge KINCHELOE. Overruled.

Mr. SPECTOR. Exception.

By Mr. SHARRETTS:

R. Q. Do you know what the usual wholesale quantity is that is sold by the mill abroad to the usual American purchaser?

Mr. SPECTOR. I object to that question.

Judge KINCHELOE. He can answer "yes" or "no"—whether he knows. Objection overruled.

Mr. SPECTOR. Exception.

By Mr. SHARRETTS:

R. Q. How much would a purchaser like Arkell or any other American purchaser buy? What would be an ordinary purchase?—A. They are very large purchasers usually; usually buy two or three hundred ton quantities.

R. Q. Well, would they represent the majority?—A. No.

R. Q. What would be the quantity in which the majority of sales would be sold to American purchasers from the Swedish mill?

Mr. SPECTOR. I object to that. No knowledge or qualifications have been shown.

Judge KINCHELOE. If you personally know you can answer; if you say so.

Mr. SPECTOR. I object on the ground that a foundation hasn't been laid to testify.

Judge KINCHELOE. Overruled.

Mr. SPECTOR. Exception.

Judge KINCHELOE. Do you personally know?

The WITNESS. Well, I know what we consider a quantity.

By Mr. SHARRETTS:

R. Q. That is what we want. We are dealing with your company and this mill, and what would be an ordinary quantity?—A. The minimum quantity about ten tons.

Judge KINCHELOE. Anything further?

Mr. SHARRETTS. That is all.

Undoubtedly the reporter made a mistake in the second question by the court herein which he transcribed: "What is the usual wholesale quantity in this country?" It unquestionably should have been "that" country. This clearly appears from Judge Kincheloe's last question. Of course, the wholesale quantity in this country

would have no effect or could be of no importance in the inquiry before us.

This testimony establishes that Mr. Baine considered the minimum wholesale quantity to be "about ten tons." It also establishes that the importers herein are very large purchasers; that they usually bought in 200 to 300 ton quantities.

There is not a single word of testimony elsewhere in the record concerning the usual wholesale quantity for exportation to the United States. The most that can be said for the above testimony is that it establishes what the witness considers the minimum usual wholesale quantities and that the Arkell Co. is a very large purchaser.

It has been frequently held that the burden is upon the importer to establish every element of dutiable value by competent evidence. See *United States* v. *Vandegrift*, 16 Ct. Cust. Appls. 398, T. D. 43120; *Meadows, Wye & Co.* v. *United States*, 17 C. C. P. A. (Customs) 36, T. D. 43324; *May Co. et al.* v. *United States*, id. 190, T. D. 43644; *United States* v. *Malhame & Co.*, 19 C. C. P. A. (Customs) 164, T. D. 45276; *United States* v. *Downing Co.*, 20 C. C. P. A. (Customs) 251, T. D. 46057. One of the elements of dutiable value is the usual wholesale quantity. The presumption which attaches to the appraiser's action cannot avail in the matter of the usual wholesale quantity in this case because the appraiser found a foreign-market value for the merchandise. The usual wholesale quantity in the foreign market for home consumption might or might not be the usual wholesale quantity for export to the United States. Not having established the usual wholesale quantity, which is a necessary element in export value, the importer has failed to sustain the burden of proof and therefore cannot prevail.

There are other errors in the decision which we deem it advisable to point out.

The special agent's report shows that there is a slight additional charge made for certain types of colored paper.

In reappraisement 105859–A, the initial case, the paper was invoiced at the unit price of $4.10 per 100 pounds. The appraiser found a foreign-market value in Swedish currency. The only invoices involved which are made out in Swedish currency are those covered by reappraisement 108865–A. Nevertheless, the single judge converted the currency in each case and found a value in Swedish öres per kilo, instead of dollars per pound, as would have been simpler. We presume the single judge felt obligated to make a finding in the currency in which the merchandise in the initial case was appraised. The testimony shows that the invoice prices, that is dollar prices, were paid in all but one case.

Conversion of currency pertains to the duty of the collector. This is recognized by the customs regulations in article 778 of the Cus-

toms Regulations of 1931, in force when these exportations were made. Section (f) of said article is as follows:

(f). The conversion of currency, being a function of the collector, is not related to the determination of the unit values of merchandise or of the costs, charges, etc., entering into the determination of dutiable values, and it is not the duty of appraising officers to find or state the value of currency.

The currency must be converted as of the date of exportation, which has been held to be the date of the last sailing of the importing vessel from the country of export.

The appraiser being without authority to convert currency, it would seem to follow that the single judge sitting on appeal from the appraisement would likewise be without authority. Nevertheless, in arriving at a value conversion of currency was made by the single judge in certain of these cases. In such conversion we observe certain errors.

There is no testimony in the record which establishes the date of export in any case. In each instance there is a bill of lading attached to the papers which bears a date, there is a certificate of the consular officer, and there is a statement on the consumption entry which gives a date of export. No proof having been offered as to the sailing dates of the various exporting vessels, and the conversion rates not having been stated in the opinion, we are left to determine if possible, by computation, the rates used by the judge below.

In all except the initial case the importer has noted the rate he used in computing the amount to be added to make market value on the duress certificates or on the entry. For instance, on reappraisement 103001–A, he used a conversion rate of $0.194941, which, according to T. D. 45581, was the exchange rate as of April 9, 1932. Yet the bill of lading is dated April 8, as is the consular certificate on each invoice and the consumption entry states the date to be April 9. A computation shows that the single judge adopted in his finding as the proper rate of conversion $0.198369.

In reappraisement 108865–A the rate used on the summary sheet by the importer is $0.260175, which was the rate used by the single judge in his computation. The date of the bill of lading is July 14, 1934, the date of the consular certificate is July 12, 1934. The conversion rate used did not correspond to the conversion rate given on any of these dates.

In reappraisement 105065–A the invoice notes the conversion rate of $0.181969, the bill of lading was dated January 4, 1933, the consular certificate January 3, 1933, the date of sailing on entry is January 5, 1933. The rate of conversion used does not correspond to any of these dates.

In reappraisement 115858–A the rate of conversion on the invoice is $0.2680. This we find was the proclaimed rate for the quarter as

shown by T. D. 45005. The bill of lading was dated June 19, 1931, the date on the consular certificate June 19, 1931, the date of sailing as per the consumption entry was June 19, 1931. The rate of conversion as given on the invoice and as used by the single judge does not correspond to the conversion rate on any of the dates mentioned.

In the absence of proof of the exact date of sailing, we are of the opinion that it was error to have accepted the conversion rates in certain of the cases as adopted by the importer, in view of the testimony that the importer paid the invoice prices which prices were in United States dollars.

It is observed in reappraisement 115858-A that upon the so-called duress certificate the importer has impressed a rubber stamp which itself is in form intended to be a duress certificate. In appropriate columns on the rubber stamp the importer has stated:

| Invoice value | | Add to make Foreign Market Value |
|---|---|---|
| 831.11 | | 50.99 |

| Foreign Market Value | Add to meet advance of appraiser in similar cases | Entered Value |
|---|---|---|
| 882.10 | 418.14 | 1300.24 |

The entered value he has carried over to the consumption entry. The item $50.99 which is added to the stated "invoice value" represents the 5 per centum selling commission. $882.10, designated as foreign-market value, is the item which the importer claims represents the export value. This appears so because he adds to that item the amount $418.14 to meet the advances made by the appraiser in similar cases enumerated. Bearing in mind that the record shows only that the importer paid the invoice prices for the instant merchandise, it must be noted that in the instant case, according to the importer's certificate, the invoice price was less than his claimed dutiable value, the difference being the amount of the selling commission.

As stated above, we find that the single judge was correct in his holding that there is no foreign-market value for this or similar paper as that value is defined in the statute (section 402 (c)). We further find that the decision below was correct insofar as it held that export value, as defined in section 402 (d), is the proper basis of appraisement.

Insofar as the decision below attempts to find what the export value of the imported paper is, it is reversed on the ground that the proof of all the elements necessary for a legal appraisement are not present, in that the record fails to show the usual wholesale quantity for export to the United States. That element being absent, this division is unable to find the values of the paper involved.

The cause is therefore remanded to the single judge with instructions to dismiss the appeals for failure of proof.

Judgment will be rendered accordingly. It is so ordered.